IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DUSTIN ALPHANSO PATRICK          :               CIVIL ACTION
                                 :
        v.                       :
                                 :
DEPUTY SHERIFF MICHAEL MOORMAN   :               NO. 11-1908

MEMORANDUM

Dalzell, J.                                      March 23, 2012

        Plaintiff Dustin Alphanso Patrick ("Patrick") sues

defendant Deputy Sheriff Michael Moorman ("Moorman"), asserting a

single claim under 42 U.S.C. § 1983 of excessive force in

violation of the Fourth Amendment.  Patrick's suit arises out of

an incident in which he robbed a bank and then fled from the

scene and attempted to elude pursuing police officers.  During

Patrick's flight, Moorman shot Patrick with his Taser, causing

Patrick to fall to the ground and sustain serious injuries.

        Moorman has filed a motion for summary judgment in

which he argues that (1) his actions constituted a reasonable use

of force that did not violate the Fourth Amendment, and (2) he is

entitled to qualified immunity.  Patrick responded to this motion

and Moorman replied, so the motion is now ripe for disposition.

For the reasons we discuss below, we will grant Moorman's motion

for summary judgment on qualified immunity grounds.

I.   <u>Factual Background</u>

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." <u>Bello v. Romeo</u>, 424 Fed. Appx. 130, 133 (3d Cir. 2011).  We will thus set out the undisputed material facts in this matter, as well as the disputed material factual assertions that the parties have supported with specific citations to the record.

A.   <u>Patrick's Crime, Flight, and Apprehension</u>

On May 8, 2009, at about ten in the morning, Patrick robbed the Wyomissing branch of VIST Bank using a demand note. Patrick ultimately pled guilty to this crime.  Def.'s Stmt. of Facts ("Def.'s Stmt.") ¶¶ 1, 3; Pl.'s Resp. to Def.'s Stmt. ("Pl.'s Resp.") ¶¶ 1, 3.  Patrick had smoked crack cocaine immediately before robbing the bank, and in the twenty-four hours preceding this crime he consumed heroin every six hours, cocaine every thirty minutes, and methadone.  Def.'s Stmt. ¶ 2; Pl.'s Resp. ¶ 2.  Following the crime, bank employees told law

enforcement that Patrick did not display a weapon but merely handed over a note, Pl.'s Stmt. of Facts ("Pl.'s Stmt.") ¶ 3; Def.'s Resp. to Pl.'s Stmt. ("Def.'s Resp.") ¶ 3, although the parties disagree as to whether this information was communicated to all responding officers.  Pl.'s Stmt. ¶ 4; Def.'s Resp. ¶ 4. Between eighteen and thirty officers from several jurisdictions responded to search for Patrick, and the parties agree that these officers heard over the radio that many officers were involved in the search.  Pl.'s Stmt. ¶¶ 8, 12; Def.'s Resp. ¶¶ 8, 12.

At the time Patrick robbed the bank, Moorman, a police officer in Berks County, was in a marked patrol car in Reading, Pennsylvania, along with another officer, Keith Neiswender ("Neiswender").  Def.'s Stmt. ¶ 29; Pl.'s Resp. ¶ 29.  Moorman and Neiswender heard over their patrol car radio that VIST Bank had just been robbed, and that the suspect was a white male with a gray sweatshirt and a large tattoo on his neck who was traveling in a residential Wyomissing neighborhood known as Colony Park.  Def.'s Stmt. ¶ 35; Pl.'s Resp. ¶ 35.  The deputies decided to head to Wyomissing to assist with the search.  Def.'s Stmt. ¶ 36; Pl.'s Resp. ¶ 36.  While en route there, Moorman and Neiswender heard further calls over the radio stating that (1) the suspect had gone through a Subway sandwich shop in a shopping

center, (2) a suspicious male had been seen lurking around cars, and (3) students at Berks Technical Institute ("BTI") had seen a person matching the suspect's description.  Def.'s Stmt. ¶¶ 37-38; Pl.'s Resp. ¶¶ 37-38.  The parties also agree that other officers radioed that[1]: (1) VIST Bank employees had followed Patrick as he left the bank, Pl.'s Stmt. ¶¶ 25-26; Def.'s Resp. ¶¶ 25-26; (2) an employee of a flower shop confronted Patrick outside the shop and "spooked" him off, Pl.'s Stmt. ¶ 31; Def.'s Resp. ¶ 31; and (3) Patrick walked by the BTI class without behaving aggressively.  Pl.'s Stmt. ¶ 33; Def.'s Resp. ¶ 33.

Moorman decided to head toward BTI.  Upon arriving in Wyomissing, the deputies slowly patrolled an office complex where a nurse from Berks Eye Center flagged them down, asked them if they were looking for a male wearing a gray sweatshirt, and advised them that she had seen the suspect run up a hill into a dumpster area in the Berkshire Commons parking lot.  Def.'s Stmt. ¶¶ 38-43; Pl.'s Resp. ¶¶ 38-43.  Moorman parked the patrol car, Neiswender transmitted the information from the nurse over the radio, and the deputies left the car to look for the suspect.

---

[1] Moorman concedes that "the Court will presume that he heard every radio transmission" for purposes of ruling on this motion for summary judgment.  Def.'s Stmt. ¶ 31 n.1.

Def.'s Stmt. ¶¶ 43-44; Pl.'s Resp. ¶¶ 43-44.  Around this time, two Wyomissing police officers arrived at the parking lot,[2] Barry Moyer ("Moyer") and an officer who has remained unidentified. Def.'s Stmt. ¶ 46; Pl.'s Resp. ¶ 46.

Moyer spoke to Moorman and Neiswender.  Moyer then went up the hill to check the dumpsters in that parking lot, while Moorman went up the hill in the direction of the Berkshire Commons parking lot and Neiswender went up the hill to the right behind several buildings.  Def.'s Stmt. ¶¶ 45, 47; Pl.'s Resp. ¶¶ 45, 47.  Moorman first searched one set of dumpsters in the back corner of the parking lot, then crossed a strip of grass into the lot towards a second set of dumpsters.  Def.'s Stmt. ¶¶ 50-51; Pl.'s Resp. ¶¶ 50-51.  While approaching these dumpsters, Moorman encountered an elderly couple who had just left a doctor's office.  They told Moorman they had seen nothing, and Moorman made sure they got into their car safely before continuing toward the second set of dumpsters.  Def.'s Stmt. ¶ 51; Pl.'s Resp. ¶ 51.

---

[2] Patrick clarifies that this lot (to which Moorman and Neiswender first drove) and the Berkshire Commons parking lot (where Patrick was ultimately found) were distinct spaces.  Pl.'s Resp. ¶ 40 (citing Ex. R to Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 166-72, 178-81).

Moorman first made contact with Patrick near this second set of dumpsters.  As Moorman searched the left side of the dumpsters, Patrick emerged from the right side.  Def.'s Stmt. ¶¶ 53-54; Pl.'s Resp. ¶¶ 53-54.  About six to eight feet separated Moorman and Patrick.  Def.'s Stmt. ¶ 15; Pl.'s Resp. ¶ 15.  Moorman recognized Patrick as the suspect from the tattoo on the right side of his neck, which measures four inches by three inches.  Def.'s Stmt. ¶¶ 55-56; Pl.'s Resp. ¶¶ 55-56.  Moorman did not see a weapon on Patrick, Def.'s Stmt. ¶ 58; Pl.'s Stmt. ¶ 58, but Patrick's shirt was not tucked into his pants, Def.'s Stmt. ¶ 58(b); Pl.'s Stmt. ¶ 58(b).  Moorman described Patrick's clothes as "baggy" and stated that he could not see Patrick's waistband.[3]  Def.'s Stmt. ¶ 59(a), (c) (citing Ex. C to Def.'s Stmt. at 199).  Patrick cites testimony from Moorman and Neiswender suggesting that they heard no broadcast over the radio suggesting that he was armed, Pl.'s Resp. ¶ 142(a), (c) (citing Ex. R to Ex. A to Pl.'s Mem. at 260; Ex. J to Pl.'s Mem. at 26).  The parties agree, however, that no witness in this matter

---

[3] Patrick challenges these characterizations of his clothes, pointing to pictures in the record of him at the time of this incident.  Pl.'s Resp. ¶ 59 (citing Exs. II & JJ to Pl.'s Resp.).  In the pictures in question, Patrick wears an indisputably baggy shirt, and his waistband is not visible.  We will thus accept Moorman's characterization of Patrick's attire.

testified that he heard a radio broadcast advising that Patrick was <u>not</u> armed.  Def.'s Stmt. ¶ 143; Pl.'s Stmt. ¶ 143.  Moorman is five feet ten inches tall and weighed 190 pounds at the time, while Patrick is six feet three inches tall and weighed 230 pounds.  Def.'s Stmt. ¶¶ 61-62; Pl.'s Resp. ¶¶ 61-62.  Moorman was carrying a firearm, a baton, and mace, Pl.'s Stmt. ¶ 54; Def.'s Resp. ¶ 54, presumably in addition to the Taser he later used on Patrick.

According to Moorman, he twice ordered Patrick to get on the ground.  Def.'s Stmt. ¶ 65 (citing Ex. C to Def.'s Stmt. at 195-96).  Patrick denies this allegation, Pl.'s Resp. ¶ 65, and at his deposition denied that he "hear[d] the officer say anything," Ex. A to Pl.'s Mem. at 66, though he also stated that he did not "recall" Moorman saying anything to him.  <u>Id.</u> at 64. Moyer then approached Patrick and Moorman, and as he came within ten feet, Patrick fled.  Pl.'s Resp. ¶ 66 (citing Ex. H to Pl.'s Mem. at 50).

Moorman gave chase and Moyer followed two or three steps behind him.  Def.'s Stmt. ¶ 69; Pl.'s Resp. ¶ 69.  Another officer, Douglas Goeltz ("Goeltz"), also joined the chase, Pl.'s Stmt. ¶ 69; Def.'s Resp. ¶ 69, and was similarly running behind

Patrick as he ran away from all three officers.[4]  Def.'s Stmt. ¶ 27(b) (citing Ex. E to Def.'s Stmt. at 219-20).

Goeltz testified that he radioed instructions to set up a perimeter on Berkshire Boulevard, in the direction Patrick was running, Pl.'s Resp. ¶ 138(a) (citing Ex. G to Pl.'s Mem. at 86, 122-23).  Another officer whose testimony Patrick cites, Robert Pehlman, id. stated that he was "certain" officers were stationed on Berkshire Boulevard.  Ex. F to Pl.'s Mem. at 33.  Neither officer suggested that they had any personal knowledge[5] that such a perimeter was, in fact, set up, and the parties agree that none of the officers deposed in this matter was personally stationed on Berkshire Boulevard or saw any other officer stationed there.  Def.'s Stmt. ¶ 138; Pl.'s Resp. ¶ 138.  Though Patrick refers to testimony from Moyer suggesting that Moyer was aware that a perimeter was being established, Pl.'s Stmt. ¶ 18 (citing Ex. H

_____

[4] Patrick denies this statement, and suggests that these three officers "converged" on him.  Pl.'s Resp. ¶ 27(b).  The evidence that he cites, however, suggests merely that Moyer and Moorman were running to the left of Goeltz, but that all three officers were pursuing Patrick from behind.  See Ex. I to Pl.'s Mem. at 141-42, 158-58, 161, 164, 168.

[5] As our Court of Appeals has explained, in ruling on a motion for summary judgment a court should ignore "unsupported assertions made in the absence of personal knowledge."  Reynolds v. Dep't of Army, 439 Fed. Appx. 150, 152 (3d Cir. 2011).

to Pl.'s Mem. at 25-26), Moyer also explained that he was not
aware of where this perimeter was being set up.  Def.'s Resp. ¶
18 (citing Ex. D to Def.'s Stmt. at 32).  During the chase, the
only police officer Moyer saw in front of him was Moorman.  He
did not see Goeltz.  Def.'s Stmt. ¶ 97; Pl.'s Stmt. ¶ 97.  Goeltz
similarly did not see any officers in front of him aside from
Moorman.[6]  Def.'s Stmt. ¶ 113(c) (citing Ex. E to Def.'s Stmt. at
217).  Patrick also did not see any officers in front of him as
he ran.[7]  Def.'s Stmt. ¶ 22 (citing Ex. A to Def.'s Stmt. at 70).

          The frame-by-frame details of the chase are disputed.
Though Moyer contends that they ran for ten to twenty seconds,
Def.'s Stmt. ¶ 75 (citing Ex. D to Def.'s Stmt. at 54-55),
Moorman testified that the chase lasted only a couple seconds.
Pl.'s Resp. ¶ 75 (citing Ex. R to Pl.'s Mem. at 213).  Patrick
testified that after the chase began, he only remembered running

---

          [6] Patrick denies this statement, but only because he
contends that Goeltz knew that other officers were stationed in
front of Patrick on Berkshire Boulevard -- not because Goeltz
actually saw those officers.  Pl.'s Stmt. ¶ 113(c).

          [7] Patrick denies this statement because he "later
clarified" that there could have been other officers chasing him
whom he did not see.  Pl.'s Resp. ¶ 22 (citing Ex. A to Pl.'s
Mem. at 163-64).  Of course, this purported "clarification" does
nothing to challenge Moorman's statement that Patrick saw no
police officers in front of him.

"a few steps, which would equal out to maybe four feet, six feet. All I can tell you is I remember a couple of steps," Ex. A to Pl.'s Mem. at 65-66.  Patrick's next memory is of "[c]oming to and my leg was handcuffed to the bed and there was a nurse walking around." Id. at 66.  Moorman testified that he closed the gap between him and Patrick to ten yards and then to ten to twenty feet before maintaining this separation, Def.'s Stmt. ¶ 68 (citing Ex. C to Def.'s Stmt. at 213-14).  Patrick suggests that Moorman and Patrick began the chase closer together, Pl.'s Resp. ¶ 67 (citing Def.'s Stmt. ¶¶ 15, 89), and that Moorman was closing the gap with Patrick.  Pl.'s Resp. ¶ 68 (citing Ex. G to Pl.'s Mem. at 144, 175, 176).  Patrick also contends that Moorman saw only four civilians in the vicinity before the chase and that there were no civilians in the direction in which they ran, Pl.'s Resp. ¶ 52 (citing Ex. R to Pl.'s Mem. at 363-64).  In the testimony Patrick cites, however, Moorman explains that before the chase began, he saw "some people in that direction [of the later chase] going into buildings," though once the chase began "there was nobody . . . in front of us at that time."  Ex. R to Pl.'s Mem. at 363.  According to Moorman, as he chased Patrick he yelled three or four times for him to stop, Def.'s Stmt. ¶ 70 (citing Ex. C to Def.'s Stmt. at 215).  At one point, he drew his

10

Taser and allegedly yelled "Taser, Taser, Taser."  Id. ¶ 74
(citing Ex. C to Def.'s Stmt. at 215).  Patrick denies that
Moorman issued any verbal warnings or commands, but for the same
reasons described above.  Pl.'s Resp. ¶¶ 70, 74 (citing Pl.'s
Resp. ¶ 65).

Patrick ran toward Berkshire Boulevard, Def.'s Stmt. ¶
73; Pl.'s Resp. ¶ 72, but between his position and the Boulevard
was a medical office building that was open to the public at the
time.  Def.'s Stmt. ¶ 73; Pl.'s Resp. ¶ 73.  Patrick denies that
he was running toward the building, Pl.'s Resp. ¶ 73 (citing Ex.
A to Pl.'s Mem. at 67), or that he had any intention of entering
it. Pl.'s Stmt. ¶ 89 (citing Ex. A to Pl.'s Mem. at 164). When
Patrick was about thirty yards from the office building, Moorman
discharged his Taser, with one probe striking the center of
Patrick's back and the other hitting the back of his head.
Def.'s Stmt. ¶¶ 76, 80; Pl.'s Resp. ¶¶ 76, 80.  Moorman activated
the Taser for one full five-second burst, upon which Patrick fell
to the ground.  Def.'s Stmt. ¶¶ 81-82; Pl.'s Resp. ¶¶ 81-82.
Moorman testified that he aimed his Taser at the center of

Patrick's back and did not aim at Patrick's head.[8]  Def.'s Stmt.
¶¶ 78-79 (citing Ex. C to Def.'s Stmt. at 216, 321).

The Taser delivered about 1200 volts of electricity
through Patrick's body, causing him to lose muscle control.  As a
result, he did not use his hands to brace his fall and fell face-
first upon the pavement.  Pl.'s Stmt. ¶¶ 103-04; Def.'s Resp. ¶¶
103-04.  Upon taking Patrick into custody, the police searched
him for weapons and recovered none.  Pl.'s Stmt. ¶¶ 38, 106;
Def.'s Resp. ¶¶ 38, 106.  As a result of being Tasered, Patrick
sustained multiple severe facial bone fractures that required
reconstructive surgery, including the placement of a steel plate
in his face.  Pl.'s Stmt. ¶¶ 115-17; Def.'s Resp. ¶¶ 115-17.

B.    **Warnings and Policies Regarding Taser Use**

Taser International, Taser's manufacturer, includes in
its product warning the following language:

> TASER-induced strong muscle contractions
> usually render a subject temporarily unable
> to control his or her psychomotor movements.
> This may result in secondary injuries such as

---

[8] Patrick infers from the fact that one of the Taser
probes hit his head that Moorman was indeed aiming for his head.
Pl.'s Resp. ¶¶ 78-79.  Given that the other probe hit Patrick's
back, and that Patrick has presented no other evidence
contradicting Moorman's testimony on this point, Patrick has not
created a genuine dispute on this issue.

> those due to falls.  This loss of control, or
> inability to catch oneself, can in special
> circumstances increase the risk(s) of serious
> injury or death. . . . [P]ersons at higher
> risk include . . . those who are running.

Pl.'s Stmt. ¶ 123; Def.'s Resp. ¶ 123.  The Berks County

Sheriff's Department bases its training program on the

recommendations of Taser International, Pl.'s Stmt. ¶ 125; Def.'s

Resp. ¶ 125, and its Taser policy provides that "'[d]eputies

shall not use a Taser'" under the following circumstances:

> When the result from a fall by the subject is
> likely to cause serious injury or death (for
> example, when the subject would fall from a
> significant height, fall into the path of
> oncoming vehicles or into operating
> machinery, fall into water where the subject
> is likely to drown, etc.), <u>except</u> in
> situations where (1) other non-lethal
> alternatives are not readily available, <u>and</u>
> (2) the subject poses an imminent threat of
> death or serious bodily harm to himself or
> others, <u>and</u> (3) the only alternative to the
> Taser would be the use of deadly force. . . .
>
> When the subject is presenting purely passive
> resistance, is merely loud or verbally
> abusive, is merely ignoring or refusing the
> deputy's commands or moving away from the
> deputy, or is otherwise merely uncooperative.
> However, nothing in this section shall be
> construed to prohibit the deputy from using a
> Taser against a subject under circumstances
> where the subject or the subject's actions
> present an immediate and articulable threat
> of bodily harm to any person, or the deputy
> has a reasonable and articulable expectation
> that it would be dangerous to approach within

> contact distance of the subject and/or to
> attempt to control the subject in some
> lesser, readily available and feasible
> manner, or use of a lesser means of force is
> not feasible due to exigent circumstances.

Pl.'s Stmt. ¶ 128; Def.'s Resp. ¶ 128.  Moorman notes that flight

by a robbery suspect from a lawful arrest constitutes physical

resistance to arrest under Berks County policies.  Def.'s Resp. ¶

59 (citing Ex. J to Def.'s Stmt. at 100-03).


II.  **Analysis**

On a motion for summary judgment, "[t]he moving party

first must show that no genuine issue of material fact exists,"

Adderly v. Ferrier, 419 Fed. Appx. 135, 136 (3d Cir. 2011)

(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)),

whereupon "[t]he burden then shifts to the non-moving party to

set forth specific facts demonstrating a genuine issue for

trial."  Id.  "'A disputed fact is "material" if it would affect

the outcome of the suit as determined by the substantive law,'"

J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915,

925 (3d Cir. 2011) (quoting Gray v. York Newspapers, Inc., 957

F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is

genuine "'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party. . . . The mere

14

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be significantly probative evidence on which the jury could reasonably find for the plaintiff." <u>Bialko v. Quaker Oats Co.</u>, 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)) (brackets omitted). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." <u>Eisenberry v. Shaw Bros.</u>, 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quotation marks omitted).

### A. **The Parties' Contentions**

Moorman argues that "a single jolt from his Taser to stop Patrick from escaping was a reasonable use of force [that] did not violate Patrick's Fourth Amendment rights," and that alternatively, he "is entitled to qualified immunity, as a reasonable officer in [his] position would not know that the use of a Taser under these circumstances violated a clearly established constitutional right." Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s Mem.") at 2. Patrick responds that a jury could find that Moorman used excessive force against him, since a reasonable police officer would (1) "not ignore actual facts

15

showing that Patrick presented no threat to the officers or public," Pl.'s Mem. at 22; (2) "have taken into account the many other police officers in a position to apprehend Patrick," id. at 23; (3) "have chosen another, more appropriate force option other than a Taser," id.; and (4) "have considered the obvious risk of severe injury to a suspect when he is tased while running across pavement."   Id.

We conclude that Moorman is entitled to qualified immunity in this matter.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. at 818.  As the Supreme Court has explained, the privilege of qualified immunity "is an immunity from suit rather than a mere defense to liability," Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (emphasis and internal quotation marks omitted), so that a court should address the issue "at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991).

As the Supreme Court noted in Saucier, courts judge a defendant's entitlement to qualified immunity in two steps.

First, a court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  533 U.S. at 201.  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  This sub-inquiry probes whether there is "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited."  McKee v. Hart, 436 F.3d 165, 171 (3d Cir. 2006).  The Supreme Court recently clarified that Saucier's two-step sequence is not obligatory: "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

We will begin by considering the first inquiry under Saucier, although we will also examine the second.

17

B.    __Whether Moorman's Conduct Violated Patrick's Rights__

Accepting Patrick's version of events regarding every issue as to which there is a genuine dispute of material fact, and drawing all reasonable inferences in his favor, the record demonstrates that: (1) Moorman was aware that Patrick was suspected of robbing a bank by means of a note; (2) Moorman had received no information as to whether Patrick had or did not have a weapon; (3) Moorman had heard that after allegedly robbing the bank, Patrick encountered a few civilians, towards none of whom he behaved aggressively; (4) Moorman was aware that many other officers were also searching for Patrick; (5) Patrick was a six-foot-three, 230-pound man wearing a baggy shirt that concealed his waistband; (6) upon encountering Moorman, Patrick fled, and Moorman pursued Patrick; (7) two other officers, Moyers and Goeltz, also pursued Patrick, albeit behind Moorman; (8) neither the officers nor Patrick saw other officers in front of Patrick; (9) Patrick's flight lasted a few seconds; (10) the officers were gaining on Patrick; (11) the area was populated, and during his flight Moorman passed within thirty yards of at least one open office building; and (12) Moorman tased Patrick, causing him to lose muscular control, fall face-first onto the pavement, and sustain serious injuries.

18

Patrick asserts that there is a genuine issue as to another material fact: whether Moorman issued verbal commands or warnings before and during Patrick's flight.  According to Patrick, he "never heard Moorman say anything to him before Moorman used the taser," Pl.'s Mem. at 14, so "[t]here is a factual dispute as to whether Moorman gave verbal commands and the extent of verbal commands he gave."  Id. at 27.

As the Court of Appeals for the Seventh Circuit has explained, where a "plaintiff did not testify that warnings were not given but only that he did not hear any warnings, [his] testimony fails to contradict the officer's positive testimony that he warned [the plaintiff]," so that "the plaintiff's testimony that he did not <u>hear</u> any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given." <u>Ford v. Childers</u>, 855 F.2d 1271, 1276 (7th Cir. 1988) (<u>en</u> <u>banc</u>) (emphasis in original).  We believe that <u>Ford</u>'s reasoning is sound, albeit with an addendum drawn from case law examining entirely different but analogous circumstances.

In <u>Eiseman v. Pennsylvania R.R. Co.</u>, 151 F.2d 222 (3d Cir. 1945), our Court of Appeals considered whether a genuine dispute existed as to whether a train gave a signal upon

19

approaching a station.  The train's engineer testified that it
was his custom to give such a signal.  The court concluded that
to create such a dispute a witness must testify not only that he
did not hear the signal, but that he "was in a position where 'in
all probability' he would have heard a bell signal if one had
been given".  If both types of evidence were in the record, "the
issue of the giving of the signal is treated as one for the
jury." Id. at 224.  Thus, one witness's testimony that "'I
didn't hear any [bell].  It was quite a distance.  I might not
have heard it if it was ringing,'" was "without substantial
probative value on the issue of whether the bell was rung," id.
In contrast, another witness's testimony that "if 'bells' had
been ringing he probably would have heard them," and that he had
no recollection of such ringing, generated an issue of fact.  Id.

        We find this logic compelling not only as it applies to
train signals, but also as to a police officer's warnings and
commands.  Moorman has affirmatively testified that upon first
encountering him he twice ordered Patrick to get on the ground,
and that while in pursuit he yelled for Patrick to stop three or
four times and then shouted "Taser, Taser, Taser" before
discharging his Taser.  Patrick's bald testimony that he did not
hear Moorman say anything and that he does not recall Moorman

saying anything -- in the absence of testimony that, had Moorman given warnings and commands, Patrick would probably have heard and remembered them -- does not create a genuine dispute of fact as to whether Moorman <u>gave</u> these warnings and commands.

Similarly, in <u>Ford</u>, 855 F.2d at 1276, the plaintiff does not appear to have offered this "probably-would-have-heard" type of testimony.  This is unsurprising in light of the court's observation that the plaintiff "was wearing both a mask and a hood, which could very well have muffled the plaintiff's opportunity to hear the warnings."  Here, Patrick has not suggested that he would probably have heard and remembered any warnings that Moorman gave -- an omission that is similarly unsurprising in light of Patrick's intense drug use preceding this incident and admitted inability to recall <u>any</u> events between the first steps of the chase and his later awakening handcuffed to a hospital bed.  Patrick has thus failed to generate a genuine dispute as to whether Moorman in fact ordered him to get on the ground, yelled for him to stop, and then shouted "Taser, Taser, Taser" before deploying his Taser.

Accepting the version of the facts described above, Moorman committed no constitutional violation when he tased Patrick while pursuing him.  As the Supreme Court has explained,

> Our Fourth Amendment jurisprudence has long
> recognized that the right to make an arrest
> or investigatory stop necessarily carries
> with it the right to use some degree of
> physical coercion or threat thereof to effect
> it.  Because "[t]he test of reasonableness
> under the Fourth Amendment is not capable of
> precise definition or mechanical
> application," however, its proper application
> requires careful attention to the facts and
> circumstances of each particular case,
> including the severity of the crime at issue,
> whether the suspect poses an immediate threat
> to the safety of the officers or others, and
> whether he is actively resisting arrest or
> attempting to evade arrest by flight.

Graham v. Connor, 490 U.S. 386, 396 (1989) (internal citations

and brackets omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 559

(1979)).  Our Court of Appeals has added that

> the fact that the physical force applied was
> of such an extent as to lead to injury is
> indeed a relevant factor to be considered as
> part of the totality. . . . Other relevant
> factors include the possibility that the
> persons subject to the police action are
> themselves violent or dangerous, the duration
> of the action, whether the action takes place
> in the context of effecting an arrest, the
> possibility that the suspect may be armed,
> and the number of persons with whom the
> police officers must contend at one time.

Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated

on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).

Importantly, "the 'reasonableness' inquiry in an excessive force

case is an objective one: the question is whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Graham</u>, 490 U.S. at 397.

Nearly all of the factors <u>Graham</u> and <u>Sharrar</u> identified support Moorman's use of substantial force against Patrick. Patrick was suspected of robbing a bank, a serious crime, and was fleeing on a business day through a populated area past occupied office buildings. We will accept Patrick's averment that he was not heading towards the open office building that was thirty yards away from him when he was tased, and will draw the (dubious) inference that a reasonable officer would not have considered it likely that a fleeing suspect might duck into such a building. Moorman's pursuit of Patrick -- a six-foot-three, 230-pound man -- itself still presented a risk of collision and injury to passers-by, without even considering whether Patrick might try to injure any of those civilians. Furthermore, Patrick resisted arrest by fleeing notwithstanding Moorman's ordering him to get on the ground -- and Moorman only had seconds to determine how to apprehend Patrick.

As for Patrick's dangerousness, he suggests that "[n]ot all robberies in Pennsylvania are forcible or violent crimes," Pl.'s Mem. at 23, that "[t]here is a factual dispute about

23

whether or not the officers heard that Patrick was armed," and
that Patrick's encounters with civilians "shows that Patrick did
not present a threat."[9]   Id. at 24.   While it is true that "in
Pennsylvania, '[a] person is guilty of robbery if, in the course
of committing a theft, he . . . physically takes or removes
property from the person of another by force however slight,'"
Forbes v. Twp. of Lower Merion, 76 Fed. Appx. 475, 478 (3d Cir.
2003) (ellipsis and emphasis in original) (quoting 18 Pa. Cons.

---

[9] Patrick presents testimony from his expert, James E.
Baranowski ("Baranowski"), suggesting, inter alia, that "a
reasonable police officer" (1) "would not assume that Patrick
presented a threat simply based on the crime he was accused of
committing," Pl.'s Resp. ¶ 91; (2) "would have taken facts
regarding whether Patrick actually displayed a weapon or was
known to be armed and the manner in which Patrick actually got
money from the bank into account when assessing the threat that
Patrick presented," Pl.'s Stmt. ¶ 6; (3) "would have relied on
the many officers in the area and the perimeter surrounding
Patrick, rather than using a Taser," id. ¶ 24; (4) "would have
taken into account Patrick's lack of aggressiveness towards the
civilians he encountered as he tried to get away as being
representative of the lack of threat he posed," id. ¶ 35; (5)
"would not have believed that Patrick would enter a medical
building," id. ¶ 97; and (6) "would have attempted to use other,
more appropriate available force options than a taser."   Id. ¶
130.   As our Court of Appeals has explained, "[a]lthough Federal
Rule of Evidence 704 permits an expert witness to give expert
testimony that 'embraces an ultimate issue to be decided by the
trier of fact,' an expert witness is prohibited from rendering a
legal opinion."   Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d
195, 217 (3d Cir. 2006).   We will thus ignore Baranowski's
opinions as to what a "reasonable officer" would have done under
the circumstances.

Stat. Ann. § 3701(a)(1)(v)), a reasonable officer could legitimately assume that one who robbed a bank -- a customarily secure, usually well-populated institution -- would have a greater willingness to use force than the average purse-snatcher, even if the complete after-the-fact record showed that the criminal accomplished the robbery by a note and not a gun. Though Moorman had not heard that Patrick was armed, he never heard that he was <u>not</u> armed -- and such an officer could reasonably act on the assumption that a suspected bank robber <u>might</u> be armed, particularly when that suspect's baggy shirt concealed the waistband of his pants.  Finally, Patrick's failure to behave aggressively towards the civilians he encountered prior to meeting Moorman has little probative value as to his dangerousness in flight.  A reasonable officer could readily conclude that a suspect who behaved non-violently while fleeing the site of a crime might behave very differently when sprinting away from imminent arrest.

    To be sure, Moorman (and his two fellow officers) outnumbered Patrick, and Patrick suffered serious injuries after Moorman tased him.  Patrick suggests that

> Moorman should not have used a Taser on
> Patrick, but rather, should have attempted to
> use other, more appropriate available force

> options.  Assuming for the sake of argument
> that Moorman gave verbal commands near the
> dumpster area and Patrick did not comply with
> those commands, open hand techniques or
> pepper spray would have been viable options
> before the chase began.  After the chase
> started, Moorman could have used a baton to
> the large muscles of the leg to create muscle
> dysfunction, without eliminating Patrick's
> ability to break his fall with his hands.
> Moorman and the other officers also could
> have tackled Patrick, or they could have
> allowed him to run until he either lost his
> will, reached the police on Berkshire
> Boulevard, or the other police officers
> arrived.

Pl.'s Mem. at 20 (internal citations omitted).

Several of Patrick's proffered alternatives to the

force that Moorman actually used would palpably have been

unsuitable under the circumstances.  To suggest that Moorman

acted unreasonably by failing to use "open hand techniques" or

pepper spray upon Patrick as soon as Patrick failed to comply

with Moorman's command to get on the ground -- though Patrick had

not otherwise resisted arrest in any way -- is preposterous.  Had

Moorman so acted, we have little doubt that he would be facing

precisely the same § 1983 claim as he is now.  As for Patrick's

contention that Moorman should have chased him out to the police

officers waiting on Berkshire Boulevard, we have already noted

that Patrick has presented no evidence from witnesses with

personal knowledge of the matter demonstrating that any officers were even stationed on that Boulevard.[10]   Patrick's final modest proposal -- that Moorman should have pursued him until he "lost his will" or "other police officers arrived" -- also fails to persuade.   An officer does not act unreasonably by taking the initiative to apprehend a suspect rather than running after him until the suspect keels over from exhaustion[11] or reinforcements render him so grossly outnumbered that he surrenders.

Only two of Patrick's proposed alternative courses of action appear to us to be theoretically practical:   tackling Patrick and using a baton to disable his legs.   We have accepted Patrick's version of events suggesting that Moorman was gaining on him, and are willing to infer that had Moorman continued pursuit he likely would have caught up to him.   We are thus left with the argument that Moorman's decision to resort to one substantial form of force -- use of a Taser -- rather than two others -- tackling Patrick to the paved ground, or disabling his legs with a baton strike -- was unreasonable.   This argument

---

[10] We also note that Patrick has presented no evidence suggesting that Moorman was aware of any such "perimeter."

[11] Assuming, of course, that the officer does not keel over first.

simply is not colorable.  While a Taser may represent a heightened level of force as compared to these two other alternatives, <u>see</u> Ex. KK to Pl.'s Resp. (presenting use of force array), the differences between the likelihood of injury to Patrick (and the officers) that each posed under the circumstances was not so great as to render Moorman's split-second decision to use the Taser unreasonable, even in light of the increased risk a Taser poses to a running (as opposed to a stationary) subject.

Resolving all factual disputes and drawing all reasonable inferences in Patrick's favor, the factors identified in <u>Graham</u> and <u>Sharrar</u> demonstrate that Moorman did not behave unreasonably by deploying his Taser to subdue Patrick -- a six-foot-three, 230-pound, possibly armed bank-robbery suspect fleeing arrest on a business day through a populated area -- when the only other options available also involved substantial use of force presenting a risk of injury to Patrick and himself.[12]

---

[12] Patrick suggests that Moorman's use of a Taser against him violated the Berks County Sheriff's Department's policies.  Pl.'s Mem. at 18-19, 28.  Our review of these policies suggests that Moorman's actions did not violate them, but in any event, violation of a police department's internal policies does not demonstrate that a <u>per se</u> Fourth Amendment violation has occurred.

C.   **Whether the Purported Right Was Clearly Established**

Even if we did not conclude that Moorman's apprehension of Patrick satisfied the strictures of the Fourth Amendment, Moorman would still be entitled to qualified immunity and a grant of summary judgment on Patrick's claim.  Patrick has pointed to no case law from this Circuit in which any facts mirrored those described above and an officer was found to have used excessive force in violation of the Fourth Amendment.  In particular, Patrick has identified no case in which a court has suggested that a defendant officer may be found liable for using a Taser to subdue a plaintiff even though the plaintiff conceded that (1) he had committed a crime, (2) he was fleeing from the defendant officer or otherwise resisting arrest, and (3) apprehending him would have required a substantial use of force.

Instead, Patrick has cited seven cases from this Circuit in which courts <u>denied</u> summary judgment on excessive force claims predicated on a defendant officer's use of a Taser. In one of these cases, the plaintiff struggled with officers but by the time he was tased had already been brought under control. See <u>Shultz v. Carlisle Police Dep't</u>, 706 F. Supp. 2d 613, 621 (M.D. Pa. 2010) (denying summary judgment where video evidence suggested that "Corporal Miller and Detective Kurtz appear to

29

have plaintiff under their control at the time that Miller uses
his Taser repeatedly on plaintiff").   In the six other cases,
evidence suggested that the plaintiff was not resisting arrest or
attempting to flee at the time he or she was tased.   See Reiff v.
Marks, 2011 WL 666139, at *2 (E.D. Pa. 2011) (Rufe, J.) (denying
summary judgment where some evidence showed that the plaintiff
"'appeared to . . . have been compliant'" at the time he was
tased) (ellipsis in original); Wilhere v. Delaware Cty., 2010 WL
1381664, at *3 (E. D. Pa. 2010) (McLaughlin, J.) (denying summary
judgment where plaintiff was tased after allegedly "rais[ing] his
arms and hands to show that he was not being physically
threatening or attempting to intimidate the sheriffs"); Boyd v.
Kissinger, 2008 WL 2550584, at *6 (E.D. Pa. 2008) (O'Neill, J.)
(denying summary judgment where plaintiff alleged that he was
pulled from his vehicle by his hair, held down on the ground, and
tased "after he explained that he wanted to get his children
home"); Buchanan v. West Whiteland Twp., 2009 WL 54949, at *3
(E.D. Pa. 2009) (Hart, Mag. J.) (denying summary judgment given
dispute as to whether plaintiff-motorist "actually revved her
engine before initially being tasered"); Henry v. City
Philadelphia, 2010 WL 3927638, at *5 (E.D. Pa. 2010)
(Strawbridge, Mag. J.) (denying summary judgment where some

evidence showed that decedent "was not armed when he stepped out

of the house in response to the officers' instructions that he

come out and that he did not move toward the officers with a

knife, or in any manner that could be deemed threatening, when

Sergeant Bradshaw employed the Taser. . . . He was not charging

at officers when he first stepped out nor did he display any

intent to flee."); Caliguiri v. City of Pittsburgh, 2009 WL

1546325, at *1 (W.D. Pa. 2009) (Lancaster, J.) (denying summary

judgment where plaintiff "contend[ed] that defendant Muoio used a

Taser International M26 ('Taser') gun on her despite the fact

that she was cooperating with the other officers who were

arresting her").  Patrick cannot claim that this jurisprudence

placed Moorman on notice that under the circumstances present

here -- where a suspect in a serious crime was resisting arrest

by fleeing and apprehension required the use of substantial force

-- tasing the suspect amounted to a constitutional violation.

Indeed, Moorman has pointed us to cases[13] in which

courts granted summary judgment on excessive force claims under

---

[13] Though each of these opinions post-date the incident
giving rise to this suit, the holdings in each draw on
established law pre-dating this incident.  Taken together, these
cases' determinations that no constitutional violation occurred
under the circumstances described suggests that Moorman's tasing
of Patrick was not clearly unconstitutional on May 8, 2009.

circumstances resembling those here.  Thus, in <u>McNeil v. City of</u>
<u>Easton</u>, 694 F. Supp. 2d 375, 393 (E.D. Pa. 2010), Judge Gardner
dismissed the plaintiff's excessive force claims in part[14]
because "plaintiff was attempting to evade arrest by flight when
Officer Snyder fired the taser at him."  In <u>Ickes v. Borough of</u>
<u>Bedford</u>, 807 F. Supp. 2d 306, 313 (W.D. Pa. 2011), Judge Gibson
held that the defendant officer was entitled to qualified
immunity where the officer tased the seventy-two year old
plaintiff in a courthouse after he "resisted [the officer's]
request that he put his hands behind his back and tried to
prevent [the officer] from turning off the tape recorder" and
"twisted his body in an effort to get away."

        Outside this Circuit, in <u>McKenney v. Harrison</u>, 635 F.
3d 354, 360 (8th Cir. 2011), the Court of Appeals for the Eighth
Circuit concluded that an officer's use of a Taser on a suspect

---

[14] Judge Gardner also predicated his decision on the
fact that "when viewed from the perspective of a reasonable
officer on the scene, plaintiff posed an immediate threat to the
safety of the officers, [his girlfriend] and himself."   <u>McNeil</u>,
694 F. Supp. 2d at 392.  As Judge Gardner explained, the
plaintiff was "very angry" and told officers that they "would
have to shoot him," <u>id.</u> at 393; moreover, the officers observed
targets in the plaintiff's home with bullet holes in them, and
the plaintiff attempt to retreat to the unsecured second floor of
his home, "where he could barricade himself or obtain a weapon."
<u>Id.</u>

as he "sought to escape through a window only six to eight feet away" was reasonable given that "[t]he alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest."  Notably, the suspect ultimately died from injuries sustained while falling from the window.

Lastly, in <u>Reiff</u>, 2011 WL 666139, at *6, Judge Rufe observed that "[i]n a handful of recent cases involving TASER use within the Third Circuit, law enforcement defendants have prevailed in their motions for summary judgment. In each of those cases, TASER use was reasonable to overcome a suspect's resistance to arrest because the Plaintiff attempted to flee, appeared to threaten officer safety, or was either armed or suspected to be armed."

Given this jurisprudence, it is evident that there was not "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." <u>McKee</u>, 436 F.3d at 171.  Even if Moorman's actions were objectively unreasonable under the Fourth Amendment -- and we have concluded that they were not -- he would be entitled to

qualified immunity for his use of the Taser on May 8, 2009.  We will therefore grant Moorman's motion for summary judgment.

BY THE COURT:

__\s\Stewart Dalzell